NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND VENTRICE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LEXINGTON INSURANCE COMPANY, *et al.*, <br><br> Defendants. | Civil Action No.: 16-660 <br><br> **OPINION** |

**CECCHI, District Judge.**

### I. INTRODUCTION

This matter comes before the Court on motions for summary judgment filed by Plaintiffs Raymond Ventrice and Kevin Ventrice ("Plaintiffs" or the "Ventrices") and Defendant Lexington Insurance Company ("Defendant" or "Lexington"). ECF Nos. 117, 118. The parties opposed each other's motions (ECF Nos. 120, 122), and filed replies (ECF Nos. 123, 124). The Court has considered the submissions made in support of and in opposition to the motions and decides the motions without oral argument pursuant to Fed. R. Civ. P. 78(b). For the reasons set forth below, the motions are denied.

### II. BACKGROUND[1]

This action arises out of an insurance coverage dispute between Defendant, an insurance carrier, and Plaintiffs, assignees of Defendant's insured. In 2008, Plaintiffs filed a professional

---

[1] Unless otherwise noted, all facts are drawn from Plaintiffs' Statement of Undisputed Material Facts ("Pls. SMF"), ECF No. 117-3, Defendant's Response to Plaintiffs' Statement of Undisputed Material Facts ("Def. Resp. SMF"), ECF No. 121, Defendant's Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment ("Def. SMF"), ECF No. 118-28, Plaintiffs' Response and Counter-Statement of Undisputed Material Facts ("Pls. Resp. SMF"), ECF No. 122-1, and the relevant record. In accordance with Local Civil Rule 56.1, any fact not properly disputed will "be deemed undisputed for purposes of the summary judgment motion[s]." L. Civ. R. 56.1(a).

negligence suit against Moore Stephens, P.C. ("Moore Stephens"), a certified public accounting firm, and one of Moore Stephens's attorneys. Def. SMF ¶¶ 1-2; Pls. Resp. SMF ¶¶ 1-2. Moore Stephens sought insurance coverage for the action from Defendant, its professional liability insurer. *See* Def. SMF ¶¶ 1, 3; Pls. Resp. SMF ¶¶ 1, 3. Defendant agreed to provide a defense but disclaimed coverage for any claim arising out of legal services. Def. SMF ¶¶ 4-5; Pls. Resp. SMF ¶¶ 4-5. Plaintiffs and Moore Stephens settled certain of the underlying claims, and Moore Stephens assigned its rights under the insurance policy to Plaintiffs. Def. SMF ¶ 35; Pls. Resp. SMF ¶ 35.

In the instant action, Plaintiffs assert that Defendant breached the implied warranty of good faith and fair dealing by wrongfully denying coverage for one of the claims and acted in bad faith in handling the claim. *See* First Amended Complaint and Jury Demand ("Compl.") ¶¶ 27-32, ECF No. 25. Defendant counterclaimed, *inter alia*, that it is entitled to a declaratory judgment relieving it from any further obligations under the insurance policy because Moore Stephens settled the claim in violation of certain Policy provisions. *See generally* Counterclaim, ECF No. 26 at 10-16; *see also* ECF No. 118-1 at 6-7, 9.

    **A. Factual Background**

        1. <u>The Insurance Policy</u>

In or about 2007, Defendant issued LexAssure Accountants Professional Liability Policy No. 1225115 to Moore Stephens for the policy period of June 1, 2007, to June 1, 2008 (the "Policy"). *See* Def. SMF ¶ 1; Pls. Resp. SMF ¶ 1; Declaration of Carl Salisbury ("Salisbury Decl."), Ex. C, ECF No. 117-2 at 20-47. The Policy provides for $2,000,000 in professional liability coverage upon satisfaction of a $250,000 self-insured retention. *See id.*; Pls. SMF ¶ 4; Def. Resp. SMF ¶ 4. Section 1.A of the Policy states, in relevant part:

> The Company [Lexington] will pay on behalf of the Insured [Moore Stephens] those sums, in excess of the Self-Insured Retention, that

> the Insured shall become legally obligated to pay as Loss Amounts resulting from a Claim that is first made against the Insured and reported to the Company during the Policy Period or the Extended Reporting Period, if applicable, as a result of a Wrongful Act by the Insured.

Salisbury Decl., Ex. C, ECF No. 117-2 at 26.  Under § II.I, the Policy excludes from coverage "Loss Amounts in connection with any Claim made against an Insured . . . based upon or arising out of any legal advice or services, or actuarial advice or services."  *Id.* at 27-28.

Under § I.C, the Policy contains the following cooperation clause:

> . . . [T]he Company [Lexington] at its option shall have the right and shall be given the opportunity to associate, at its own expense, with the Insured [Moore Stephens] in the investigation, defense or control of any Claim which would likely result in a settlement or judgment in excess of the Self-Insured Retention, in which event the Insured and the Company shall cooperate in the defense or settlement of such Claim."

*Id.* at 27.  Section I.C further provides, in relevant part, that "the Insured [Moore Stephens] shall take no action or agree to any settlement which alone or together with Defense Costs will exceed the Self-Insured Retention, without the prior written consent of the Company [Lexington]."  *Id.*

2. The Underlying Action

In March 2008, Plaintiffs filed a professional negligence action in the Superior Court of New Jersey, Law Division (the "Underlying Action") against Moore Stephens and its attorney, Charles Falk, Esq. ("Falk").  Def. SMF ¶ 2; Pls. Resp. SMF ¶ 2; Salisbury Decl., Ex. A, ECF No. 117-2 at 5-9.  In August 2008, Plaintiffs amended the complaint in the Underlying Action, alleging with specificity that Moore Stephens failed to: (1) file a timely gift tax return; and (2) complete the tasks necessary to establish a Qualified Personal Residence Trust ("QPRT").  Pls. SMF ¶ 2; Def. Resp. SMF ¶ 2; Salisbury Decl., Ex. B, ECF No. 117-2 at 10-19.

3

3.  Defendant's Coverage Position

Moore Stephens tendered the Underlying Action to Defendant for defense under the Policy. *See* Def. SMF ¶ 3; Pls. Resp. SMF ¶ 3; Salisbury Decl., Ex. D, ECF No. 117-2 at 48-52. By letter dated May 27, 2008, Defendant acknowledged receipt of the Underlying Action. Salisbury Decl., Ex. D, ECF No. 117-2 at 48-52. The May 27, 2008, letter described the Underlying Action, identified relevant Policy provisions, reserved Defendant's rights, and "disclaim[ed] coverage for any allegations relating to deficient legal services" in accordance with the Section II.I of the Policy. *Id.* By about September 2012, Moore Stephens had exhausted the Policy's self-insured retention. Pls. SMF ¶ 13; Def. Resp. SMF ¶ 13.

On November 12, 2012, Kathryn Ridenour ("Ridenour"), an attorney employed by Defendant who had taken over handling Moore Stephens's coverage claim, sent a letter to Moore Stephens concerning Defendant's coverage position. *See* Pls. SMF ¶¶ 12, 15; Def. SMF ¶¶ 12, 15; Salisbury Decl., Ex. I, ECF No. 117-2 at 80-82. The letter incorporated Defendant's prior letter by reference and stated that Defendant "is providing a defense . . . subject to its reserving the right to deny coverage in the future on grounds set forth in the letter of Ronald W. Gorski of Lexington to you dated May 27, 2008." Salisbury Decl., Ex I, ECF No. 117-2 at 81. The letter further noted that Plaintiffs were seeking damages in part for "taxes incurred because the real property that was to fund the Qualified Personal Residence Trust set up by Attorney Falk allegedly was not transferred" in a timely manner. *Id.* With respect to that amount, Defendant stated the following:

> It appears that, if awarded to the plaintiffs, the $1,291.815.63, or any other amount in federal and state estate tax alleged by the plaintiffs to have been incurred because the subject property was not transferred to the Trust on or before November 18, 1999, would constitute a "Loss Amount" that was based upon or arising out of legal services performed by Attorney Falk. Accordingly, as set forth in Mr. Gorski's letter, there would be no coverage for any such "Loss Amount" under Policy No. 1225115.

4

*Id.* at 82. Defendant indicated that it would continue to provide a defense and indemnify Moore Stephens for any "covered" loss that may be awarded against it in the Underlying Action, but urged Moore Stephens "to take all steps necessary to protect its own interest with respect to any amount that may be awarded to the plaintiffs that is excluded from coverage by operation of Exclusion I or any other provision of the policy." *Id.*

On December 16, 2013, Ridenour held a conference call with: (1) Ruth Simon ("Simon"), defense counsel for Moore Stephens in the Underlying Action; (2) Joseph Corcoran ("Corcoran"), a Moore Stephens representative; (3) James Flannery ("Flannery"), another Moore Stephens representative; and (4) Russell Hewit ("Hewit"), Moore Stephens's personal counsel. *See* Pls. SMF ¶ 19; Def. Resp. SMF ¶ 19; Def. SMF ¶ 13; Pls. Resp. SMF ¶ 13; Salisbury Decl., Ex. J, ECF No. 117-2 at 83-84. Ridenour memorialized the call in a claim file, noting that she had "reiterated Lexington's coverage position that the majority of the damages (approximately $1.25M of the $1.5M) arise from legal services for which there is no coverage under the policy." Salisbury Decl., Ex. J, ECF No. 117-2 at 84.

On December 17, 2013, Hewit sent Defendant a letter advising of Moore Stephens's coverage position and acknowledging Moore Stephens's duty to cooperate. ECF No. 118-12. By letter dated January 31, 2014, Ridenour responded to Hewit's December 17, 2013 letter. Salisbury Decl., Ex. L, ECF No. 117-2 at 87-92. The letter stated that Defendant "maintains that it is not obligated to indemnify Moore Stephens in connection with any claim that is 'based upon or aris[es] out of any legal advice or services…,' which includes any damages that may be awarded that arise from the Qualified Personal Residence Trust ("QPRT") prepared by Attorney Falk for Mrs. Ann Ventrice." *Id.* at 88. In support of Defendant's position, the letter pointed to New Jersey case law, allegations in the Underlying Action complaint, and "additional factual support establishing that

5

Attorney Falk's services related to the QPRT constitute 'legal services' and that the Ventrices' allegations related to the QPRT are 'based upon or arise[] out of… legal advice or services." *Id.* at 89-90. It further stated that "[w]ithout question, the Ventrices' alleged damages related to the QPRT 'arise from' . . . Attorney Falk's 'legal services' in preparing the QPRT and arranging for the conveyance of the Florida property. Such damages are, therefore, excluded from coverage under Exclusion I of the Policy." *Id.* at 90. The letter noted that Defendant would "attend mediation with settlement authority corresponding to the *covered* exposure, subject to its reservation of rights," "reiterate[d] that Lexington will not have settlement authority to cover any damages arising from legal services," and "urge[d] Moore Stephens to take all steps necessary to protect its own interest with respect to any amount that may be awarded to the plaintiffs that is excluded from coverage by operation of Exclusion I or any other provision of the Policy." *Id.* at 90, 92.

On April 17, 2014, four days before the April 21, 2014 trial in the Underlying Action was set to begin, Dianna Manning ("Manning"), coverage counsel for Defendant, sent a letter to Hewit. *See* Salisbury Decl., Ex. R, ECF No. 117-2 at 115-20. In the letter, Manning noted that "[a]s specifically indicated previously in Ms. Ridenour's January 31, 2014 letter, the factual allegations of the parties in this case clearly evidence that Mr. Falk was providing legal services." *Id.* at 117. The letter further explained that "Lexington has been providing a defense because, arguably, there are limited covered claims under the Policy," and "reserve[d] the right to deny coverage on alternative bases presently unknown to Lexington should the underlying facts or theories so warrant." *Id.* at 119. Notwithstanding its reservation of rights, "Lexington acknowledge[d] that there may be limited exposure for the gift tax return element of the Claim that could be considered as arising from covered accounting services." *Id.* Accordingly, "Lexington would consider

6

offering up to $248,000 towards settlement, which represents the total alleged damages associated with the gift tax return issue and, therefore, the maximum exposure for this covered element of the Claim." *Id.*

That same day, Hewit responded to Manning's letter and confirmed Moore Stephens's understanding of Defendant's position as follows:

> This will confirm that Lexington will defend all claims filed by the Ventrices, including full defense at trial provided by Ruth Simon, subject to various reservations of rights asserted by Lexington. To be clear, we believe the reservations are without merit, and the disclaimer of indemnity coverage for the claims related to transferring the Florida property into the QPRT is a breach of the insurance contract.

Salisbury Decl., Ex. S, ECF No. 117-2 at 122.

### 4. Alleged Breach of the Duty to Cooperate

Defendant alleges that shortly before trial, "Hewit, engaged in settlement negotiations with the Ventrices' counsel, Carl Perrone [("Perrone")], to release Moore Stephens from any personal liability and assign to the Ventrices Moore Stephens's coverage claim against Lexington." Def. SMF ¶ 30. Defendant cites an April 14, 2014, email from Hewit, in which Hewit allegedly "'coached' the Ventrices on how to try their claims against Moore Stephens, in such a manner that the Ventrices' claims might be covered by the Policy, and not subject to the Policy's exclusions." *Id.* On April 20, 2014, Hewit sent an email to Perrone, stating that he was "not sharing our settlement efforts with Lexington or Ruth Simon. I would not comment further to her." ECF No. 118-24 at 2.

### 5. Settlement of the Underlying Action

The Underlying Action proceeded to trial on April 21, 2014. Pls. SMF ¶ 42; Def. Resp. SMF ¶ 42. On the first day of trial, Plaintiffs along with Moore Stephens, through its personal

counsel Hewit, settled the QPRT claim and agreed to arbitrate the gift tax claim at a later date. Def. SMF ¶ 35; Pls. Resp. SMF ¶ 35. Under the settlement, "the Ventrices released the QPRT Claims for $805,000, which included (i) an assignment of Moore Stephens' rights under the Policy against Lexington, and (ii) a payment of $25,000 from Moore Stephens to the Ventrices." *Id.* Plaintiffs also "agreed 'not to seek recovery of any further monies or compensation from Moore Stephens, but to seek recovery for such additional monies and compensation from Lexington . . . .'" *Id.* Hewit placed the terms of the settlement on the record and informed the court in the Underlying Action that Defendant had denied coverage for the QPRT claim. *See* Salisbury Decl., Ex. T, ECF No. 117-2 at 125-31. Although Simon and Defendant's coverage counsel were present at the hearing, there is no indication that either informed the court or Plaintiffs' counsel that Hewit's representations were incorrect. On or about May 1, 2014, Simon prepared the Order of Dismissal in the Underlying Action, which confirmed the terms of the settlement of the QPRT claim. Salisbury Decl., Ex. U, ECF No. 117-2 at 132-34.

### B. Procedural History

On or about July 8, 2014, Defendant commenced a JAMS Arbitration against Moore Stephens, seeking declaratory relief that: (1) "Lexington is not obligated to indemnify Moore Stephens in connection with any claim that is based upon or arises out of any legal advice or services"; (2) "Moore Stephens has breached the terms and conditions of the Policy by settling the legal malpractice claim in the Ventrice action without Lexington's consent or participation"; and (3) Moore Stephens improperly assigned its interests under the Policy to Plaintiffs. ECF No. 118-26.

On or about January 22, 2016, Plaintiffs filed the instant action in the Superior Court of New Jersey, which Defendant then removed to this Court. ECF No. 1. In the operative First

Amended Complaint filed herein in federal court, Plaintiffs assert two claims: (1) breach of the implied warranty of good faith and fair dealing (Count I); and (2) bad faith (Count II). ECF No. 25. Defendant counterclaimed for, among other things, a declaratory judgment relieving it of any further obligations under the Policy as a result of Moore Stephens's alleged breach of the Policy's consent provision. Counterclaim Count I ¶¶ 19-22, ECF No. 26.[2]

On January 31, 2017, the JAMS panel issued an award concluding that the "legal services" exclusion of the Policy does not apply to the settlement for which Moore Stephens seeks indemnity, and therefore does not bar indemnity for that settlement. *See* ECF No 118-27; Def. SMF ¶ 39; Pls. Resp. SMF ¶ 39. The panel declined to rule on the coverage defenses raised by Defendant relating to Moore Stephens's failure to obtain Defendant's consent to settle and Moore Stephens's bad faith and fiduciary claims. Def. SMF ¶ 40; Pls. Resp. SMF ¶ 40.

On October 2, 2018, this Court denied Defendant's motion for judgment on the pleadings seeking a declaration that it had no further obligations under the Policy because there was a "genuine issue of material fact . . . as to whether Defendants timely and validly reserved its rights under the Policy." ECF No. 101 at 13.

### C. Instant Motions

After discovery was complete, the parties moved for summary judgment, opposed each other's motions, and filed replies. ECF Nos. 117, 118. In Defendant's reply brief, it raised for the

---

[2] Defendant also counterclaimed for a declaratory judgment relieving it of its obligations under the Policy as a result of Moore Stephens's alleged improper assignment of its interest under the Policy to Plaintiffs ("Counterclaim Count II"), because the amount of the settlement was unreasonable ("Counterclaim Count III"), and because the arbitration awards should be vacated ("Counterclaim Count IV"). Defendant previously withdrew Counterclaim Count II, *see* ECF No. 101 at 4 n.1, and does not substantively address Counterclaim Count III in its summary judgment submissions. The Court previously administratively terminated a motion to confirm the arbitration awards pending resolution of the question of whether Plaintiffs are entitled to coverage under the Policy. *See* ECF No. 101 at 8.

first time the argument that Plaintiffs' claims are barred by the statute of limitations. ECF No. 123 at 13-15. With leave of Court, Plaintiffs filed a sur-reply on November 21, 2021, addressing Defendant's statute of limitations argument. ECF No. 142. On December 15, 2021, Defendant filed a sur-sur-reply on the same issue. ECF No. 145. The Court has duly considered all submissions.

### III. LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of proving the absence of any genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). In order to meet its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact," the opponent must "exceed[] the 'mere scintilla' threshold . . . ."). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *See Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *See id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The legal standard for summary judgment does not change when both parties file motions for summary judgment. *Bacon v. Avis Budget Group, Inc.* 357 F. Supp. 3d 401, 413 (D.N.J. 2018) (internal quotations and citations omitted).  According to the principles outlined above, in reviewing each motion, "the court construes facts and draws conclusions in favor of the [non-moving party]." *Id.* (internal quotations and citations omitted).

### IV. <u>DISCUSSION</u>

Plaintiffs advance several arguments in their briefing, including that: (1) there is no genuine dispute that Defendant denied indemnity coverage for the QPRT claim prior to the settlement; (2) by denying coverage for the QPRT claim, Defendant waived its right to enforce, or is equitably estopped from enforcing, the Policy's consent and cooperation provisions; and (3) Defendant's conduct amounts to both a breach of the implied warranty of good faith and faith dealing and bad faith. *See* ECF No. 117-1 at 32-44; Compl. ¶¶ 27-32.

Defendant contends that: (1) contrary to Plaintiffs' assertion, it never in fact denied indemnity coverage for the QPRT claim but merely reserved its right to deny coverage in the future; (2) Moore Stephens breached the Policy's consent provision by failing to obtain Defendant's consent before settling with Plaintiffs and the Policy's cooperation provision by allegedly "coaching" Plaintiffs on how to maximize their coverage; (3) if Defendant is found to

11

have denied indemnity coverage before settlement, its denial would not waive its right to participate in the settlement and Plaintiffs claims in any event would be time-barred; and (4) Plaintiffs have failed to demonstrate bad faith. *See, e.g.*, ECF No. 118-1 at 24-33; ECF No. 120 at 19-29, 31; ECF No. 123 at 17-19.

### A.   Declaratory Judgment

The Court will first address whether Defendant is entitled to a declaratory judgment relieving it of further obligations under the Policy. Defendant claims that Moore Stephens breached the Policy by failing to seek or obtain Defendant's consent before settling the Underlying Action and colluding with Plaintiffs. *See* ECF No. 118-1 at 6-7. As a result of these alleged breaches, Defendant argues, it is relieved of any further obligations to Plaintiffs under the Policy. Plaintiffs contend that Defendant itself first breached the Policy by improperly denying indemnity coverage on the QPRT claim before settlement. *See, e.g.*, ECF No. 122 at 10-11. Plaintiffs argue that by breaching the Policy, Defendant waived its right to enforce, or is equitably estopped from enforcing, the consent and cooperation provisions. *Id.* Defendant counters that if Plaintiffs' argument that Defendant first denied coverage in 2008 is accepted, Plaintiffs' claims are barred by the six-year statute of limitations. *See* ECF No. 123 at 17-19.

As a threshold matter, the Court finds that there is a triable issue of fact as to when, or whether, Defendant denied indemnity coverage on the QPRT claim. The parties agree that under New Jersey law, a "six-year statute of limitations ordinarily applies to insurance actions." *Liguori v. Certain Underwriters at Lloyds London Subscribing to Pol'y |AJD8955*, No. 14-5898, 2015 WL 4402851, at *2 (D.N.J. July 17, 2015). To "determin[e] when a cause of action accrues so that the applicable period of limitation commences to run, the relevant question is when did the party seeking to bring the action have an enforceable right. . . . [I]n regard to an action for breach of contract, the date of accrual of an enforceable right is tied to the date that the defendant breached

the contract." *21st Mortg. Corp. v. Chicago Title Ins. Co.*, No. 17-03456, 2018 WL 6716081, at *4 (D.N.J. Dec. 21, 2018) (internal citations and quotation marks omitted).

Here, if Defendant is found to have first denied indemnity coverage on May 27, 2008—the date of its first coverage position letter—Plaintiffs' claims, which were first asserted on January 22, 2016, would be untimely under the six-year statute of limitations. The Court finds that there is a genuine dispute of material fact as to whether Defendant's 2008 letter constituted a denial of coverage or a mere reservation of rights to deny coverage in the future. While Defendant's 2008 letter did generally reserve its rights and disclaim coverage for allegations related to deficient legal services, it did not contain the details concerning the QPRT claim as Defendant's later communications did. *Compare* Salisbury Decl., Ex. D, ECF No. 117-2 at 51 (May 27, 2008 letter noting that "Lexington hereby disclaims coverage for any allegations in the Lawsuit relating to deficient legal services"), *with* Salisbury Decl., Ex. L, ECF No. 117-2 at 90 (January 31, 2014 letter stating that "[w]ithout question, the Ventrices' alleged damages related to the QPRT 'arise from' Attorney Falk's 'legal services' in preparing the QPRT and arranging for the conveyance of the Florida property. Such damages are, therefore, excluded from coverage under Exclusion I of the Policy."). On this record, the Court cannot say, as a matter of law, whether Defendant denied indemnity coverage in 2008, rendering Plaintiffs' claims untimely. Because this threshold issue

must be resolved before the Court can determine whether Defendant is entitled to enforce the consent and cooperation provisions, the Court must deny summary judgment at this time.[3]

While the Court need not reach beyond this threshold issue, it notes that if Plaintiffs' claims are timely, the record may present additional issues of material fact that must be resolved by a factfinder.  For example, Defendant contends that even if it is found to have denied indemnity coverage before the settlement, its denial would not waive its right to participate in the settlement because it continued to provide Plaintiffs with a defense.  *See* ECF No. 120 at 31 n.4.  Even if the Court were to accept, *arguendo*, Defendant's position, there may remain a triable issue of fact as to whether Defendant is equitably estopped from enforcing the consent and cooperation provisions.  Estoppel is an "equitable doctrine, founded in the fundamental duty of fair dealing imposed by law" that "requires the reliance of one party on another."  *Knorr v. Smeal*, 178 N.J. 169, 178 (2003) (internal citations and quotation marks omitted).  "[T]o establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment."  *Id.* at 178.

---

[3] Plaintiffs also contend that their claims are timely because the limitations period began on the date the settlement was reached, the statute of limitations reset itself with each coverage letter, and Defendant's initiation of arbitration preserved Plaintiffs' claims.  *See* ECF No. 142 at 5, 8-9. Plaintiffs' contentions are unpersuasive.  First, as noted above, the limitations period begins on the date the alleged breach occurred, and there is a genuine dispute as to if or when a breach occurred. *See 21st Mortg. Corp.*, 2018 WL 6716081, at *4.  Second, while Plaintiffs assert that the limitations period reset because each coverage communication until 2013 invited Plaintiffs to provide additional information, *see* ECF No. 142 at 8-9, courts in this District have found that a mere invitation to provide additional information, without more, does not necessarily toll the limitations period.  *See G. Matts Hosp., LLC v. Scottsdale Ins. Co.*, No. 17-6826, 2019 WL 4745604, at *4 (D.N.J. Sept. 30, 2019) (noting that without more, "reservation of rights language . . . allowing the insured to provide 'additional information that you believe will have a material effect on [the] determination of coverage' does not serve to vitiate the letter's status as a denial of coverage") (internal citation omitted).  Finally, Plaintiffs cite no authority suggesting that Defendant's initiation of an arbitration proceeding operated to preserve Plaintiffs' affirmative claims.

14

Here, the record indicates that Defendant, *inter alia*: (1) sent a pre-settlement letter to Plaintiffs stating that Plaintiffs' damages related to the QPRT claim arose from legal services and were excluded from coverage under the Policy, *see* Salisbury Decl., Ex. L, ECF No. 117-2 at 90; (2) was informed by Moore Stephens's personal counsel shortly before the settlement was reached that Moore Stephens intended to settle with Plaintiffs unless Defendant admitted to coverage for the QPRT claim, *see* Deposition of Russell Hewit ("Hewit Dep.") Tr. at 117:5-15, Salisbury Decl., Ex. H, ECF No. 117-2; and (3) after Moore Stephens's personal counsel informed the court in the Underlying Action that Defendant had denied coverage for the QPRT claim, Defendant's coverage counsel and Simon never informed the court that such representations were incorrect, *see* Salisbury Decl., Ex. T, ECF No. 117-2 at 125-31.[4] Such circumstances may raise a triable issue as to whether Defendant's conduct induced detrimental reliance.

Given the record in this case, the Court will deny summary judgment in either party's favor on Defendant's declaratory judgment counterclaim.

---

[4] Hewit informed the court in the Underlying Action that he represented Moore Stephens "with respect to claims made by the plaintiffs on which their professional liability carrier disclaimed coverage. Those are claims that I'll use as an umbrella term relate to the qualified personal residence of trust and the failure or the alleged failure to transfer a Florida property into that trust on a timely basis. Coverage was disclaimed on those claims." Salisbury Decl., Ex. T, ECF No. 117-2 at 128. After the court asked for further clarification, Hewit reiterated that Defendant is "[d]isclaiming on the claim we settled [the QPRT claim]. They are not disclaiming on the gift tax claim . . . So the claim which they are providing coverage is proceeding to trial unless it's otherwise resolved. What I'm going to call the QPERT [sic] claim, they [Defendant] have disclaimed coverage on." *Id.* at 129.

### B. Claims for Breach of the Implied Warranty of Good Faith and Fair Dealing and Bad Faith

The parties also seek summary judgment in their respective favors on the two claims Plaintiffs assert in the Amended Complaint: (1) breach of the implied warranty of good faith and fair dealing (Count I); and (2) bad faith (Count II). *See* ECF Nos. 117-4, 118-29. The Court finds that there is a triable issue of fact as to the viability of these claims.

As an initial matter, the Court notes that while Count I asserts a claim for breach of the implied duty of good faith and Count II asserts a claim for bad faith, these claims appear to be duplicative. Courts in this District have found that "[w]here, as here, an insurance contract is at issue, a claim for breach of the implied covenant of good faith and fair dealing is tantamount to a claim for bad faith." *Veyhl v. State Farm Fire & Cas. Co.*, No. 21-10112, 2021 WL 6062304, at *2 (D.N.J. Dec. 22, 2021) (internal citation and quotation marks omitted); *see also Laing v. Am. Strategic Ins. Corp.*, No. 14-1103, 2014 WL 4953250, at *2 (D.N.J. Oct. 1, 2014) ("Counts Two and Three of the Complaint assert claims of breach of the implied duty of good faith and fair dealing and the tort of bad faith, respectively. . . . [U]nder New Jersey law, these two claims are tantamount to the same cause of action. . . . Accordingly, the two claims will be decided as one.") The Court will therefore analyze both claims together.

To establish a claim for bad faith, a plaintiff must demonstrate that "(1) the insurer lacked a fairly debatable reason for denying coverage, and (2) insurer knew of or recklessly disregarded the lack of a reasonable basis for denying coverage." *Stiso v. State Farm Fire & Cas. Co.*, No. 13-5741, 2015 WL 7296081, at *9 (D.N.J. Nov. 18, 2015). "A claim is fairly debatable if a plaintiff cannot establish as a matter of law a right to summary judgment on the substantive claim, *i.e.*, the underlying contract claim." *Laing*, 2014 WL 4953250, at *3 (internal citation and quotation marks omitted).

Here, factual issues preclude summary judgment on these claims. It is undisputed that the arbitration panel concluded, as a matter of law, that the legal services exclusion in the Policy did not apply to the QPRT claim. *See* Pls. SMF ¶ 56; Def. Resp. SMF ¶ 56. However, the panel's conclusion has yet to be judicially confirmed, *see* ECF No. 101 at 8, and, as noted above, there is a dispute of fact as to the timeliness of Plaintiffs' coverage claims. In addition, Defendant has cited to evidence from the Underlying Action that Falk considered his services legal in nature. *See* Def. SMF ¶¶ 25-27; Pls. Resp. SMF ¶¶ 25-27. Because a factfinder is better suited to resolving such conflicts in the evidence, the Court will deny summary judgment on Counts I and II.

V.    **CONCLUSION**

For the reasons set forth above, Plaintiffs' and Defendant's motions for summary judgment (ECF Nos. 117, 118) are denied. An appropriate Order accompanies this Opinion.

**DATED**: July 28, 2022

                                                s/ Claire C. Cecchi
                                        **CLAIRE C. CECCHI, U.S.D.J.**